LOTTINGER, Judge.
The trial judge in this expropriation proceeding has so thoroughly and painstakingly analysed the question of quantum that (with minor modifications hereinafter stated) we set forth his reasons for judgment as follows:
“This is a suit by the plaintiff to expropriate the following described property, to-wit:
“Three (3) certain lots or parcels of ground, together with all buildings and improvements thereon situated, also all rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the City of Baton Rouge, Parish of East Baton Rouge, State of Louisiana, and more particularly described as follows:
“First: Lot Twenty-six (26) of Square Two (2) or Square Two hundred ninety-three (293) of University Park Subdivision, fronting forty-eight (48) feet of the East boundary line of North Ninth Street (Mills Avenue) and running back in an easterly direction, between parallel lines, a distance of seventy-six (76) feet.
“Second: A parcel of ground located immediately in the rear of Lot twenty-six (26), above-described, which said parcel is more fully described as follows : Beginning at the northeast corner of Lot Twenty-six (26) (as described in No. 1 above) and run thence East a distance of sixty-two (62) feet to a point; thence South fifty-one and 67/100 (51.67) feet to a point; thence West to the East line of Lot twenty-five (25) of Square Two (2) or Square Two Hundred ninety-three (293) of University Park Subdivision, a distance of sixty-two (62) feet; thence North along the East line of Lots Twenty-five (25) and Twenty-six (26) to the point of beginning, which said parcel of ground was taken from the West end of a lot located in Square Forty-seven (47) of Suburb Nicaragua.
“Third: Another parcel of ground located East of the property secondly above-described, beginning at the southeast corner of the property secondly above-described and run East a distance of fifty-nine (59) feet to a point (which point is seventy-one (71) feet West of North Tenth Street or Elam Street); thence North on a line parallel to North Tenth Street or Elam Street a distance of fifty-one and 67/100 (51.67) feet to a point; thence West a distance of nine (9) feet to a point; thence South ten (10) feet to a point; thence West fifty (50) feet to the East line of the property secondly above-described; thence South along said line a distance of forty-one and 67/100 (41.67) feet to the point of beginning.
“Plaintiff alleges that the expropriation of said property is necessary in order that it may construct a certain project known as State Project No. 817-34-05 and Federal Aid Urban Project No. U-414 (4), which project is for the construction of a four-lane, concrete highway as a controlled-access facility and along a new location which has been designated a part of State Route La. 3022 and the Baton Rouge Expressway, beginning north of Capitol Lake in the City of Baton Rouge and extending southward between North Ninth and North Tenth Streets for a distance of approximately 0.83 of a mile to North Boulevard.
“Certain exceptions filed herein by the defendants were overruled by judgment signed by Judge Henry F. Turner on February 4, 1958. The defendants, by answer timely filed, are claiming as just compensation for the property taken the sum of Fifty-five Thousand and No/100 ($55,000.00) Dollars. As the record discloses, plaintiff deposited in the registry of the court the sum of Thirty-one Thousand One Hundred and No/100 ($31,100.00) Dollars as just compensation for the property.
“The only matter for adjudication is the fair market value of the property expropriated.
*553 “Reversing the usual order of procedure, which is the accepted practice in cases of this kind in this jurisdiction, the defendants placed their witnesses on the stand first. Mr. J. B. Alexander, an expert appraiser, well known to the court, testifying as such, stated that there were no comparable sales in the area, in so far as the house was concerned, so he undertook to establish the replacement cost of defendants’ dwelling. In this connection, he engaged the services of two licensed contractors, Mr. C. J. Comeaux and Mr. Warren C. Holden, to assist him. Before testifying further as to replacement cost, Mr. Alexander gave a history and description of the house on the subject property. He testified that when the defendants purchased the subject property in 1916 there was a one-story bungalow thereon. In 1928 this structure was demolished down to the floor and foundation and the present dwelling was constructed on the site out of the best building materials available at that time. He said the dwelling has been maintained in the best of condition throughout the years and that its life’s expectancy would be approximately fifty years. In describing it, he recited that it consisted of a two and one-half story single family, frame and stucco dwelling. It had eleven (11) rooms, exclusive of bathrooms. The first floor contained a living room, dining room, hall, bedroom, bathroom, breakfast room, and kitchen. The second floor contained four (4) bedrooms, a hall, and two (2) bathrooms. All bedrooms had cedar-lined closets, full-length mirror doors. The bathrooms had flooring of ceramic tile and were equipped with high grade fixtures. There were five (5) fireplaces in the house, and the house was equipped with three floor furnaces. The third floor of the house had a playroom measuring 18 x 41^4 feet, which was reached by using a disappearing stairway. The front and side porches of the house had quarry tile floors and ornamental grillwork, and metal awnings. In the kitchen, there were a stainless steel sink, a dishwasher and disposal system, and cabinets. The double garage and servants’ toilet had concrete floors with frame construction. The yard was landscaped with a patio. (See D-6, D-7, and D-8). He stated that the house presented a pleasing appearance and was located in a good neighborhood. There were other good two-story homes located in the same neighborhood. This locality, Mr. Alexander stated, was situated near the business district of Baton Rouge, and near the state capítol.
“As stated above, Mr. Alexander employed the services of two licensed recognized building contractors to arrive at the replacement cost of the house on the subject property. One of these, Mr. C. J. Comeaux, estimated a replacement cost of $51,751.00. (D-l). Mr. Warren C. Holden’s estimate of replacement cost of the house was $50,726.00 (D-12). Mr. Alexander took the average of these two figures and then applied a twenty percent (20%) factor for depreciation, which gave him a net replacement cost of the improvements of Forty Thousand, Nine Hundred Ninety-one and 50/100 ($40,991.50) Dollars.
“By using the comparative approach, this expert arrived at a land value of $12,000.00, which sum added to $40,991.50, the value of the improvements, gave him a total of $52,991.50, which he testified was the fair market value of the subject property at the time of the taking.
“Mr. Alexander used five comparable sales of property in the area to arrive at his land value of $12,000.00 for the subject property. These sales are listed in his written appraisal filed in evidence. (D-15). These comparables are very familiar to the court, as they have been used by expert appraisers in other expropriation suits tried in this Division involving land in the area taken by plaintiff for the project described in plaintiff’s petition. All of these compar-ables are located in Zone C of the city of Baton Rouge. The subject property is likewise located in Zone C. The witness explained that Zone C permitted the erection of multiple dwellings, single family dwellings, churches, schools (nursery, *554 kindergarten, elementary, high schools), garage apartments, boarding and lodging houses, hospitals (except animal hospitals) and professional offices.
“Mr. Alexander stated that from information disclosed by the five comparable sales the sum of $2.25 per square foot was the minimum paid for the land only. He valued the subject property, (land only) 9400 square feet, at $1.28 a square foot. The location of the subject property was on a parity with the location of the comparables, in his opinion.
“This witness, in considering the highest and best use of the subject property, and in support of his evaluation thereof, used what he termed a ‘commercial approach’. This testimony was objected to by the State on the ground that a prospective commercial value would be too remote and speculative. Since it already had been established that the subject property was located in Zone C, which permits certain commercial establishments, the court overruled the obj ection. It was Mr. Alexander’s opinion that the improvements on the subject property could advantageously and at low cost be converted into a doctors’ clinic, with ample parking space in the rear for twenty automobiles. It is a known fact, as experts have attested, that depth is a distinct asset for property located in Zone C in the city of Baton Rouge. He stated that ¡he thought it would be definitely possible to use this property for that purpose if it were put on the open market.
“It is the court’s understanding of trie law that such evidence does not furnish a conclusive measure of market value, but tnat evidence of this character is admissible as tending to show a use for which the subject property is available, and as shedding light on market value, which must be determined by consideration of all factors affecting the property. This factor is particularly impressive when the expert believes, as in this case, that the property can thereby be put to its highest and best use.
“The other expert appraiser called by the defendants was Mr. Harvey E. Thomas. His qualifications as such were admitted by counsel for the plaintiff. He testified that the physical appearance of the house, both inside and outside, was very good. Defendants’ house was the best in the neighborhood, according to Mr. Thomas. In discussing its physical condition, he said: ‘I think that this home showed that it had top maintenance, and I think that a reasonable expectancy of the life of that home with the past maintenance program kept up would be at least forty years.’
“This appraiser used the same compa-rables that defendants’ other appraiser used in arriving at land value. He was interrogated as to why he used those particular comparables. They were located, he explained, in Zone C, the same as the subject property, and about five or six or seven blocks therefrom and about the same distance from the business district of the city. It was his opinion that the neighborhood where the comparables were located was equal to the neighborhood where the subject property is located. ‘If anything, I think the Bates home is in a better residential area,’ he added. Mr. Thomas said he agreed with defendants’ other expert, Mr. J. B. Alexander, that the subject property could be used as a doctors’ clinic to good advantage without undue costs. He testified that there would be ample parking area for such use, pointing out that there would be a parking area for a minimum of twenty cars.
“By using the comparable method as to land value he arrived at the sum of $11,-750.00 as the fair market value of the land alone. This was on the basis of $1.25 a square foot, there being 9400 square feet in the subject property. In considering the fair market value of the improvements, he availed himself of the detailed estimates made by Mr. Warren Holden and Mr. C. J. Comeaux, which were discussed in connection with Mr. Alexander’s testimony. He averaged their estimates as to cost of replacement and then used a 20% depreci *555 ation factor. This gave him the sum of $40,991.00 as the net value of the improvements. This latter sum added to his land value of $11,750.00, gave him a total value of $52,741.00 (he rounded this figure to $52,740.00) as the fair market value of the subject property.
“On cross-examination Mr. Thomas when asked if he just accepted the comparables which he used because the attorney for the defendants gave them to him, replied: ‘No, sir, I got an area map and checked the location, I checked the zoning on the two areas and determined that they were as near a comparable as we could obtain.’ (Tr. 111). Counsel for plaintiff asked this witness the following question: ‘Did you consider finding some two story residence comparable in size and physical make-up with this house (the Bates house) as a comparable?’ His answer was: T would have been glad to have found a comparable if I could have found one within the close in area. I think the location of this property requires a comparable within the same zone area and so forth. I don’t think a house two or three miles from the business district has any connection with this house.’ (Tr. 116).
“Mr. Warren Holden, an experienced building contractor, well known to the court, testified on behalf of the defendants as to replacement costs of the improvements on the subject property. He stated he made a complete examination of the improvements, first with Mr. Bates, one of the owners, and then by himself, before he compiled his estimate. In giving a general description of the Bates’ house he said: ‘Well, the house was a frame stucco building, with a brick and concrete foundation, plastered inside, oak floors, good millwork, lifetime roof, inside walls were plastered.’ The house was in exceptionally good condition, he explained. According to him, the very best type workmanship went into the house. From what he could observe he said the best type materials were used. Mr. Bates informed him that the materials he could not see were the very best. This information was confirmed, he testified, when he visited the house as it was being demolished. He described the stucco as having been much better applied than stucco-is being applied at the present time. It was in good condition. In making his estimate Mr. Holden said he contemplated the best materials that could be presently purchased. Many of the materials were not presently available. His estimate, he stated, to replace the Bates’ house amounted to the sum of $50,726.00.
“Mr. Holden stated positively that the square foot method of estimating the cost of building a home is not accurate. In this connection, he pointed out: ‘The only way to estimate a house is to estimate the items specified in the plans and specifications.’ After completing a house and with all the costs before him he could determine its cost per square foot of floor space to build, he explained. Then, he said, you could, from a mathematical point of view, determine how much per foot another house of that kind and size would cost.
“This witness made the statement that a two-story house was more expensive to build than a one-story house and explained why this is so. (Tr. 16 & 17.)
“Defendants introduced in evidence the deposition of Clevins J. Comeaux. Mr. Comeaux is an experienced building contractor who specialized in building homes and small commercial buildings. For the last two years he said he had specialized in erecting large finer type homes. He testified that he made a four-hour inspection of the Bates’ home, going all over the house, including the basement, with a view of arriving at the estimated cost required to build a home just like it at today’s’ prices. He took measurements and made sketches and later computed the cost. The replacement cost arrived at by him was the sum of $51,751.00. (See D-S).
“Mr. Comeaux testified that the Bates’ home was in good shape and had been well-maintained. He voiced the opinion that the house had been built by expert mechanics. He stated the front of the house had a con *556 Crete porch with a brick chainwall and was covered with quarry tile flooring. The steps had the same type tile. There were eight full wood columns with precast stone heading for appearance sake. In addition, there were handmade ornamental iron railings around the porch and down the steps.
“Mr. Comeaux testified that in making an estimate to replace a home he did not use the method of figuring the cost on a square-footage of the floor space, because that method was not accurate. He explained that one has to figure what actually has to be done and what specifically has to go into the house. It was his opinion that there is no such thing as a blanket, accurate figure per square foot for building a good home unless a similar house had previously been built.
“Mr. Jewel L. Bates, one of the defendants, gave a history of the dwelling house on the subject property. He said it was erected in 1928 on the spot where there had previously been a bungalow. This bungalow was torn down to the flooring and foundation and the present dwelling was built thereon. The foundation was checked by an architect, he stated, all in accordance with the City Building Code. The original sills were used in the construction of the new house. In this connection, he testified as follows: ‘They are chain wall sills around the house and a chain wall concrete foundation, and the floor joists that were originally in that bungalow are still there. They were still there as of the date they took my property from me.’
“He said he moved into the house in November of 1928 and thereafter in 1940 there was some maintenance work done, painting on the inside and outside, but no construction repairs made. From year to year he examined the house. In his opinion there was not as much as $200.00 worth of termite damage in the house. On May 7,- 1956, he paid L. S. ‘Bugs’ Bridges the sum of $80.00 for termite treating his home.
“Eric McVadon, a photographer, was called as a witness for defendants and identified photographs (D-6 to D-ll) inclusive, depicting views of the defendants’ home from the- inside and from the outside.
“The plaintiff called Mr. Lowell M. Rose-man, realtor, as an expert appraiser. To the knowledge of the court he has been used as expert appraiser for the Department of Highways in all suits filed by that state department involving expropriation of property for the project described in plaintiff’s petition. Mr. Roseman identified the map attached to plaintiff’s petition (P-23), as giving the measurements of the subject property. He testified that upon his first inspection of the property it presented a very good condition. It was larger and better apportioned inside than the other houses located in the general neighborhood, he stated. In appraising the subject property Mr. Roseman testified: T used the replacement, less depreciation, and the market data approach. The income approach is more or less a check and it was completely out of line on this house, and would not have given a fair value, so we discarded it.’
“In figuring replacement of the Bates’ residence, Mr. Roseman took the first floor containing 1465 square feet at $10.00 per square foot, which resulted in the sum of $14,650.00. The second floor, 1363 square feet, he figured at $7.00 per square foot, giving a total of $9,541.00. The third floor, 720 square feet, he figured at $3.00 a square foot, or a total of $2160.00. The rear porch, 84 square feet, he figured at $3.00 a square foot; the front porch, 234 square feet, at $5.00 a square foot; a side stoop or entry, 168 square feet, at $1.00 a square foot. According to him that gave him a total of $27,941.00 for the residence. He depreciated this figure at 20%, which gave him a net value of $22,352.00 for the residence. To this sum he added $714.00 for the garage and $1250.00 for yard improvements, which gave him a total of $24,316.00 as depreciated replacement value for all improvements on the subject property.
*557 “In arriving at the market value of the land, which he said contained 9400 square feet, he valued the front part of the property, 48 feet by 76 feet, at $75.00 a front foot, which gave him a value of $3600.00. He took the rear portion of the property, 5752 square feet, at $.50 a square foot, which gave him a value of $2876.00 which, added to $3600.00, gave him a total of $6476.00, which he rounded out at $6500.00 for the land. This land value, added to $24,316.00, his value for the improvements, gave him a total value for the entire subject property of $31,816.00, which he rounded out at $31,800.00.
“When asked about what comparables he used, he stated that he was unable to find anything in a two story nature in the immediate vicinity. The first comparable was located at 963 Westmoreland Drive, which he admitted was quite some distance from the subject property. Land values in that area, he stated, were as high or higher than in the area of the Bates’ home. It was a two-story frame stucco dwelling, 8 rooms, composition roof, in good condition, located on a lot measuring 120 feet front by 228.9 in depth. It was purchased June 16, 1955 for $25,000.00 by Hewes T. Hughes from William L. Wolf. In comparing this property with the subject property, he said: ‘It’s a more modern house than the subject property, built originally from the ground up as a two story house, and the land is more valuable due to the wider frontage.’ He did not know the age of the house.
“The next comparable is located at 505 L. S. U. Avenue in College Town below the L. S. U. campus, several miles from the subject property. It was purchased March 16, 1956, by Dr. Henry George McMahon from Eugene A. Conway for $28,500.00. The land measured 150 feet front by 165 feet in depth and was situated on a corner. The house is framed, two story, ten rooms, three baths, asbestos roof, built about 1926. It was his opinion that real estate values-in College Town were better than in the area where the subject property was located. This property, he stated, had a little more than three times as much frontage as that of the subj ect property. When asked how the improvements compared with the improvements on the subject property, his answer was: T think they compare very favorable.’
“Another comparable used by Mr. Rose-man is located at 4444 Claycut Road, at the corner of Longwood Drive in Glenmore Place, which is several miles distant from the subject property. It was purchased February 11, 1957 by Dr. Frank Jones for $30,000.00. Mr. Roseman stated that property values in Glenmore Place were better than values in the locality of the subject property. This comparable had a front of 100 feet. He said the house was more modern than the dwelling on the subject property and was ‘built as a two story from the ground up.’
“This expert appraiser did not use any other comparables. (Tr. p. 222).
“Mr. Roseman when asked: ‘Did you think it necessary for you to go so far afield to find property that was actually comparable to this (subject) property.’ His answer was that it is a normal and common practice throughout the country by recognized appraisers that if one can not find a sale in the immediate neighborhood one should go to as close a comparable neighborhood as possible. This question was propounded to him: ‘And as a matter of fact, you have testified that there was no such thing as a sale of a two story residence anywhere close to this property, is that correct.’ He replied: T searched my records of every subdivision in the area that I knew anything about and I could not find a sale that had a two story house on it.’
“It will be noted that Mr. Roseman drew all of his comparables from strictly residential areas located at distant points from the subject property and did not use any com parables located in Zone C of the City of Baton Rouge, which zone permitted multiple uses of property, as heretofore *558 explained. The court takes judicial notice of the fact that Mr. Roseman, while testifying as an expert appraiser for the Department of Highways, several times used the Jimmie R. Major property (a two story house) as a comparable to fix value of property expropriated in the area of the subject property in this lawsuit. (This comparable is listed as Item 2 in D-1S filed herein). In fact, while testifying for the Department of Highways in suit No. 61,-595, State of Louisiana, Through The Department of Highways vs. Miss Evelyn Ware Perkins, which involved the taking of a two story house and the land on which it stood, located in the same area and zone as the subject property in this suit, he used the Jimmie R. Major property as a comparable and stated his reasons therefor, as follows, to-wit: ‘The lots are quite similar, the zoning was the same, it is a two-story house. Adjustments had to be made for the extremely large size of the house.’
“The other expert appraiser used by the plaintiff was Mr. Bradley C. Mittendorf, who, along with Mr. Lowell M. Roseman, signed the Certificate of Estimate of Just Compensation, attached to plaintiff’s petition. Mr. Mittendorf did not appear as a witness on the trial of the case, but his deposition was introduced in evidence by plaintiff, with the stipulation that his qualifications were admitted.
“Mr. Mittendorf stated that he examined the subject property for about one hour. In arriving at the replacement value of the improvements he said he did not recall whether he used $9.00 or $10.00 a square foot for the first floor of the dwelling house. As for the second floor, he said he used about of that figure. With regard to the third floor, he said he did not see it, stating he was afraid to go up there, because he suffered from dizziness. It was his opinion, however, that the third floor ‘added very little to the value of the property.’ He valued the iron fencing on the property at $250.00, and the garage and servant’s toilet at $750.00. The witness explained that he did not figure these two latter items on replacement. He figured them on present value. Mr. Mittendorf did not remember how much depreciation he allowed for the house. He thought 20% was about right; maybe 25%.
“Mr. Mittendorf used the same three comparables that Mr. Roseman used plus one additional comparable. The latter was the house located on Park Boulevard in Roseland Terrace many blocks from the subject property. This house was sold by O. M. Thompson to Frank Fleming, the date of the sale not being given by the witness. He did not testify as to the measurements of the property, but did mention that the house had eight rooms and two baths. He did not know the number of square feet in the Fleming house, but he stated that he did not think it equalled the square footage of the Bates’ house. It was his opinion that the Thompson (Fleming) house was a better house than the Bates’ house. He stated that the Hewes’ house was not as good as the house on the subject property. It was his view that the Frank Jones house was ‘very comparable’ to the Bates’ house. When asked how did the McMahon house compare to the Bates’ house, he stated that he was only on the front porch of that house and did not go inside. He talked to the occupants of the McMahon Home.
“Mr. Mittendorf, when interrogated as to his purpose in selecting the four compara-bles that he used, answered as follows: ‘Well, they were recent sales, they were— all of them had a second floor.’
“From Mr. Mittendorf’s deposition the court is unable to ascertain the exact value he placed on the improvements on the subject property or upon the land itself. It is true he signed the Certificate of Estimate of Just Compensation attached to plaintiff’s petition, which sets forth: ‘Value of Land and Improvements $31,100.00.’
“The two expert appraisers for the defendants and the two licensed contractors who figured the replacement cost of the Bates’ home all testified that the square *559 foot method used by plaintiff’s expert appraisers, Mr. Roseman and Mr. Mitten-dorf, was not accurate. The court feels that the actual detailed estimates of the contractors, Mr. Warren Holden and Mr. Clevins J. Comeaux, which amounted to $50,726.00 and $51,751.00, respectively, as the gross replacement cost, are about as accurate as possible. As pointed out in this opinion, the two expert appraisers who testified for the defendants, averaged these two estimates and then took a depreciation of 20%. This left a net figure of $40,-991.50, as the actual value of the improvements on the subject property. The court adopts this sum as the value of the improvements.
“As to the value of the land, the appraisers for the defendants used sales of land located within the area of the subject property and in the same zone as the subject property. The court is very familiar with all the comparables used by them in arriving at the land value of the subject property. It is the opinion of this court that these sales represented the market values, or the prices which would be agreed upon at voluntary sales between willing sellers and willing purchasers, taking into consideration all available uses to which the lands might be put. State through Department of Highways v. Ragusa, 234 La. 51, 99 So.2d 20, and cases cited therein. See also comprehensive Comment, ‘Expropriation — A Survey of Louisiana Law,’ 18 La.Law Review 509 (1958) at 538 et seq. ‘The rule is well settled that the best ■guide in determining the market value to which the owner is entitled under the law in expropriation suits is evidence of sales ■of similar or comparable properties in the vicinity.’ Rapides Parish School Board vs. Nassif, 232 La. 218, 94 So.(2d) 40.
“Based on the values of the compara-bles (land value only) Mr. J. B. Alexander fixed a value on the subject property of $1.28 a square foot amounting to $12,000.00. ■On the same basis, defendants’ other appraiser, Mr. H. E. Thomas, placed a value on the subject property of $1.25 a square foot, totalling $11,750.00. Both of these valuations, in the opinion of the court, based on the evidence and the court’s personal knowledge of the comparables and the subject property, are conservative. The court will adopt the lesser sum of $11,750.-00, as the market value of the subject property (land only). This sum of $11,-750.00 added to $40,991.50, the value of the improvements, gives the total of $52,741.50, rounded to $52,740.00. Both Mr. Alexander and Mr. Thomas supported their valuations of the subject property by using a realistic consideration of a definite use to which it may be put. They called this the ‘Commercial Approach.’ Both were of the opinion, because of the zone the property was located in, the size and condition of the house and the depth of the land which lent itself to adequate off-street parking, that the Bates’ property could be converted into a doctors’ clinic without undue cost and that it could be sold for that purpose. To the knowledge of the court, there was at the time of the taking of defendants’ property and is at the present time a doctors’ clinic located in the vicinity on North Seventh Street.
“In the opinion of the court, it was proper for defendants’ appraisers to take into consideration this use to which the subject property could be put. ‘It is well settled in suits of this kind (expropriation suits) the most profitable use to which the land can be put by reason of its location, topography, and adaptability will be considered as bearing upon market value.’ This quotation from the case of Louisiana Power & Light Company vs. Simmons, 229 La. 165, 85 So. (2d) 251, was quoted with approval in Parish of Lafayette v. Hernandez, 232 La. 1, 93 So. (2d) 672. In the recent case of Parish of Iberia v. Cook 228 [238] La. 697, 116 So. (2d) 491, the Supreme Court said: ‘In determining the market value of property expropriated, it must be conceded that it is not merely the value for the use for which it has been applied by the owner that should be taken into consideration. The *560 possibility for its use for all available purposes for which it is adapted and to which it might in reason be applied should be considered. The ultimate test of value in that respect is what men of wisdom and prudence and having adequate means would devote to the property if owned by them.’
“The court has given serious consideration to the valuations, land and improvements, placed on the subject property by plaintiff’s experts. In the opinion of this court these valuations are too low. As pointed out above, they did not utilize any comparables situated in the area, but admittedly went far afield to find comparables. All the comparables considered by them were located in strictly residential areas, far removed from the area of the subject property. These comparables were located in zones different from that of the subject property. No testimony was given by these experts as to the possible commercial use to which the subject property could be put. Since, in the opinion of defendants’ experts (an opinion concurred in by the court, because of its independent knowledge of the subject property and its location), the whole property, land and improvements, could be used as a doctors’ clinic and would be marketable for that purpose,' it is the opinion of the court that the land should have been appraised by all the experts on a squarefootage basis, as was done by defendants’ experts. Plaintiff’s expert, Mr. Roseman, employed the front foot method, using a valuation of $75.00 a front foot, for only 48 feet by 76 feet of the subject property, although defendants’ home, garage, servant’s quarters and landscaped garden occupied a depth considerably more than 76 feet. (See P-23 attached to plaintiff’s petition). From the deposition of Mr. Mittendorf, plaintiff’s other expert appraiser, the court does not know what method of appraisal or what basis of valuation was used by him in arriving at the land value of the subject property. Had plaintiff’s experts used the known compara-bles in the area of the subject property, which defendants’ experts used, it would have necessarily followed that the figure of $75.00 per front foot, for 48 feet by 76 feet of defendants’ land, and the basis of $.50 a square foot for the remainder thereof, were obviously and patently too low.
“In fixing the value of the improvements-on the subject property the plaintiff’s two-experts used the square foot method in arriving at the replacement costs. For lack of anything more accurate the court would accept this method; however, the evidence shows that the expert contractors, Messrs. Holden and Comeaux, made actual detailed estimates and reports of the replacement costs. These latter, in the opinion of the court, are more accurate and complete, and are accepted by the court as to the gross, replacement costs of the improvements. The court approves the averaging of these two figures, as was done by defendants’" expert appraisers. All expert appraisers in the cttse agreed on 20% as the proper figure to use for depreciation of the improvements when figuring replacement value.
“Plaintiff introduced certain evidence relative to termite damage to the house on the subject property. All the experts are in agreement that they did not observe any termite damage when they appraised the house. The court is convinced! from the evidence that the owners of the property were not aware of any termite damage at the time their home was expropriated. The court is convinced that the owners took excellent care of their home and that had they known of any such damage they would have promptly had the necessary repairs made.
“Since the termite damage was not known at the time of the taking, in the opinion of the court, it could not affect adversely the fair market value of the property. In the event of a sale of the property, where the purchaser subsequently discovered the termite damage, he could file suit in such & situation against the owners in ‘quanti minoris’ under Revised Civil Code Article 2541 for ‘the amount necessary to convert *561 the unsound structure into a sound one’. Lemonier v. Coco, 237 La. 760, 112 So.2d 436.
“Of course, an expropriation is not a sale; however, it is the opinion of the court that in a case such as this, there should be sub.rtracted from the award of the court for the market value of the property an amount sufficient to make the necessary repairs to the dwelling on the subject property. The question arises as to the amount to be fixed by the court for this purpose. The plaintiff placed Mr. Alfred Miller, a man who had been engaged in the termite eradication business for a little over three years as a licensed termite man and prior thereto as an apprentice in the business. Altogether, his experience in this business extended over a period of seven years. The court ruled that he was an expert in this field. He testified that when he inspected the dwelling on the subject property it was in the year 1958, following the date of August 5, 1957, when the property was expropriated. The top of the house at the time of his inspection had been removed. Objection was urged to the admissibility of this testimony, on the ground that the inspection was made at a time too remote. The court referred the objection to the effect. It was later shown by the testimony of other witnesses that the dwelling with its top portion removed had been exposed to the weather for a period of months. He stated that the remainder of the house bore evidence of termite damage in different places and that ‘two places had activity of termites at the present time.’ (Tr. p. 154). According to Mr. Miller, termite damage extended from the ground to the top of the first floor of the building. He said several of the supporting studs, in the front and rear of the building were damaged, as well as some ceiling joists between the two floors. In his opinion, the building was subject to a major termite damage. He said it was difficult to tell how old the termite damage was, but estimated it to be ‘anywhere from possibly a year and a half to two years.’ (Tr. p. 166). The building had been treated for termites, he testified, but he did not know whether the damage had been done before the building was treated or after-wards.
“While on direct examination Mr. Miller identified several photographs which he said depicted termite damage (Exhibits P-12 through P-21). On cross-examination, he admitted that of these ten photographs, four of them (P-21, P-18, P-17, and P-13) all related to the same points on the building, namely, the northeast corner thereof. The witness testified P-14 and P-15 referred to the same area — underneath the building on the south side. P-12 he said shows damage in the rear of the building about fifteen feet from the area shown in P-14 and P-15.
“This expert testified that the extent of the damage done by termites depended upon the size of the colony of termites in a building. It was his testimony that he saw only a small colony of termites in the Bates’ dwelling. He was asked this question: ‘So there weren’t lots of termites in there? His reply was ‘No, sir.’ (Tr. p. 171). Mr. Miller admitted that none of the sills were damaged to the extent of needing replacement and that he observed only from twenty to twenty-two studs that were damaged. Of these, he stated eight or nine needed replacing. These were located in the northeast corner of the building. The rest of the studs that needed replacement were located in the northwest corner on the inside of the structure and consisted of six in number, four of them being corner studs, nailed together. This witness admitted that he was unable to testify with certainty that the live termites which he saw did not come after August 5, 1957, the date the subject property was expropriated. Summing up his testimony, Mr. Miller stated that there were a certain amount of sheathing (how much he did not know) and about twenty to twenty-two studs that needed replacement. Also, one complete window frame needed replacement, he added. He did not know what outlay of money would be required to make the building structur *562 ally sound. He considered the building to be structurally unsound in the two corners where the damaged studs were located. The pillars, sills and floor joists were all in good shape. (Tr. p, 180).
“Mr. Miller was asked on direct examination whether he would accept a contract (termite contract) on the house in the condition he found it to be at the time of his inspection. He stated that he would not. (Tr. p. 156). Later, on cross-examination, he admitted he would take a contract and issue the usual guarantee to the owners against future termite damage if a certain condition were eliminated. (Tr. p. 179)
“From the foregoing resume, the court has to evaluate Mr. Miller’s testimony in the light of the time when, and the prevailing circumstances under which, his inspection of a remnant of the dwelling on the subject property was made. It must be pointed out that there was no testimony from any witnesses as to any termite damage to the dwelling on August 5, 1957, when the property was expropriated. In fact, Mr. W. F. Martin, who purchased the dwelling from plaintiff in the month of October, 1957, testified it appeared to him at that time to be perfectly solid and that he did not find any weak spots anywhere prior to a demolition thereof by him and one Woodrow Beach.
“Mr. Martin and Woodrow Beach both testified that they demolished the dwelling on the subject property by first removing the roof, the half-story and the second story and eventually tearing down the first story. After removing the upper portions of the house what was left remained exposed to the elements for several months. A tarpaulin was placed over the ceiling of the botton story but admittedly it did not keep out rain and moisture. Mr. Martin explained that he had difficulty in securing a man to move the first story of the house. It was his intention, he stated, to move it elsewhere and then to use it as a dwelling. After employing a man named Porter Kent, what remained of the house was jacked up from the concrete porch, which was securely attached to the house by reinforced concrete. (See Exhibit D-39). This procedure, which caused the reinforcing steel rods to break, in the opinion of the court, exerted tremendous pressure on the walls, causing them to bulge outward. It must be born in mind that this was a stucco house. When this situation developed, Mr. Martin said he abandoned his plan to transport the lower floor of the house, and ordered it demolished.
“Knowing Mr. Martin and Mr. Beach intimately and well for a number of years, the court quite frankly placed very little credence in their testimony. In the opinion of the court, their statements were grossly exaggerated.
“The only witness in the case who testified as to the cost of repairing the termite damage to the Bates’ home was Mr. J. B. Alexander. It will be recalled that he is one of the expert appraisers who testified as to the market value of the subject property. He stated that he had examined the photographs which had been offered in evidence by the plaintiff and that he had made several inspections of the house during the course of its demolition. He testified that he did not notice any appreciable termite damage during those inspections, but he stated that at the time he was not looking for termite damage. Mr. Alexander stated that after listening to all the witnesses who testified as to termite damage, he would reduce the amount of his appraisal of the improvements by $2000.00 or $2500.00. The maximum amount of reduction by him would be $3000.00. (Tr. p. 233). He stated further: ‘Since it (the house) has been torn down I know the exact amount of damage (termite damage). I would have altered my appraisal about $2500.00, $3000.00 maximum.’ (Tr. p. 240). The court will take the average of these two figures, or the sum of $2750.00, as. the amount necessary to repair the termite damage to the house. This is the only definite evidence in the record as to the extent moneywise of the termite damage.
*563 “Having previously found the market value of the improvements on the subject property to be the sum of $40,991.50, without any consideration of the termite damage, the court now reduces that figure by $2750.00, leaving a remainder of $38,241.-50, as the fair market value of the improvements. This sum, added to $11,750.00, the market value fixed for the land, gives a total of $49,991.50, which the court rounds at $50,000.00, as the fair market value of the entire property expropriated.
“Accordingly, judgment is rendered and will be signed herein in favor of the defendants and against the plaintiff in the sum of $50,000.00, this amount to be subject to a credit of $31,100.00 which was deposited in the registry of the court by the plaintiff on August 5, 1957. The sum awarded herein, less the amount deposited in the registry of the court, or the net of $18,900.00, shall bear interest at the rate of five (5%) per cent per annum from August 5, 1957 until paid.
“Judgment is also rendered and will be signed herein in favor of the defendants and against the plaintiff approving the fee of the expert appraiser, J. B. Alexander, at $350.00, and the fee of the expert appraiser, H. E. Thomas, at $350.00, for their appraisal work and assessing these two sums against the plaintiff as costs. Judgment is also rendered and will be signed herein in favor of the defendants and against the plaintiff, approving the fee of the expert contractor, Warren Holden, at $75.00, and the fee of the expert contractor, Clevins J. Comeaux, at $174.00 (for making estimate and drawing plans), and assessing these sums against the plaintiff as costs. Judgment is also rendered and will be signed herein in favor of the defendants and against the plaintiff, approving the bill of the photographer, Eric Mc-Vadon, (McVadon’s Studio) in the amount of $46.35, for taking pictures of the Bates’ dwelling, and assessing this amount against the plaintiff as costs. The court also approves the following items of expense incurred by the defendants: Deposition of Messrs. Roseman and Mittendorf, $78.00; deposition of Clevins J. Comeaux, $38.25; deposition of William F. Martin, $34.50, and judgment is rendered and will be signed herein in favor of defendants and assessing all of these sums against the plaintiff as costs.
“The evidence shows that at the time of the taking of defendants’ property they were living in the dwelling thereon. They moved from the subject property within a period of thirty days from the date of the expropriation and established themselves temporarily in a rented house at 2147 East Lakeshore Drive, in Baton Rouge. They remained at this address for a period of six months while a new permanent home was being erected for them. At the end of this period they moved into their new home.
“The court permitted the introduction into evidence of numerous items of expense incurred by the defendants in connection with their moving from the condemned premises to temporary quarters and finally to their permanent home. All of these offerings were objected to by the plaintiff on the ground that under the law they were not compensable. Defendants also made a claim for attorney’s fees in the amount of $3000.00, and a claim for interest on borrowed money, which were objected to by the plaintiff. The court, under the law and jurisprudence, finds that although the defendants suffered considerable hardship, expense and inconvenience growing out of the taking of their property, these items are damnum absque injuria, with one exception. It is the opinion of the court that the defendants should be reimbursed in the amount of $229.05 (D 21 B), to cover the cost of moving their furniture and effects from the condemned premises. Judgment is rendered and will be signed accordingly. It is evident to me that this expense rises above mere inconvenience. Plaintiff condemned the subject property, but not its contents. If defendants had not removed the movables they would have been lost or destroyed. Of course, as *564 pointed out above, the cost of their subsequent removal from the temporary quarters occupied by the defendants to their permanent home is not compensable. By the same line of reasoning, the court would allow the expense incident to removing fixtures, air-condition units, et cetera from the subject property, but the court is unable to determine from the evidence how much of this expense is attributable to their removal and how much to their subsequent installation elsewhere.
“The court reserves to the defendants the right to proceed by appropriate action to have the court fix the expert witness fees of J. B. Alexander, Harvey E. Thomas and Warren Holden, for testifying as such on the trial of this case.
“Judgment is also rendered and will be signed in favor of the defendants and against the plaintiff, condemning the latter to pay all costs of this suit.”
The defendants appellees have answered the appeal taken by the State seeking an increase in the award to cover attorney fees and other items for which they claim their clients are entitled to reimbursement by way of “just compensation for the taking”. None of these items, however, were alleged or referred to in the pleadings, the prayer of the answer seeking only the sum of $55,000 which was alleged in Article 17 of the answer (Tr. page 42) to be the true value of the property taken. Under the pleadings, therefore, none of these items is allowable nor was the award of $229.05 proper. See Rapides Parish School Board v. Nassif, 232 La. 218, 94 So.2d 40. The judgment will be decreased accordingly.
The State contends, and correctly so, we think, that the award of $46.35 for the pictures taken by the McVadon Studio was improper. The services performed in taking these pictures were not those contemplated by L.S.A.-R.S. 13:3666 and should not be allowed.
For the reasons assigned, the judgment anpealed from is amended so as to reduce the award to defendants by the sum of $229.05 and, further, so as to disallow as costs the sum of $46.35; in all other respects, the judgment appealed from to stand affirmed.
Amended and affirmed.
HERGET, J., concurs in the decree.